Clifton Pratt SHELTON, Appellant,

v.

WEBSTER COUNTY SOIL CONSERVATION DISTRICT et al., Appellees.

WEBSTER COUNTY SOIL CONSERVATION DISTRICT et al., Appellants,

v.

Glenn WATSON, Appellee.

Court of Appeals of Kentucky.

Feb. 21, 1964.

Rehearings Denied April 17, 1964.

Dorsey & Sullivan, Henderson, Warren B. Miller, Dixon, for Webster County Soil Conservation Dist. and others.

Damon A. Vaughn, Dixon, for Clifton Pratt Shelton and Glenn Watson.

MOREMEN, Judge.

The above styled cases have been consolidated for hearing in this Court. The questions presented in each suit are not identical, but under the peculiar circumstances a decision in the second case will render answering the question in the first case unnecessary.

Appellee Watson instituted an action for a declaratory judgment to construe KRS 262.700 et sequitur which deal with Watershed Conservancy Districts.

On March 9, 1957, the Crab Orchard Creek Watershed Conservancy District was formed. (Hereinafter referred to as Watershed District.) A watershed conservancy district is a sub-district of county soil conservation districts. The statute provides that if the watershed lies in more than one county, it may be organized under the soil conservation districts of those counties and is to be governed by a joint board of supervisors of the county districts.

In 1960 the Watershed District levied a tax. Thereafter the legality of the creation of the Watershed District was attacked in a suit styled Noah Dixon Watson vs. Webster County Soil Conservation District. That suit resulted in a judgment confirming the legality of the formation of the Watershed District and the judgment was affirmed upon appeal to this Court. Thereafter the constitutionality of Chapter 262 was attacked by Clifton Shelton. About a month later Glenn Watson also filed a suit which concerned the problem of whether the District should be discontinued under the terms of the statute. The trial court sustained the constitutionality of the statute in the first suit, but decided in the second suit that a referendum should be held in connection with the discontinuance of the Watershed District. These are the two above styled actions which are being heard together.

The petition for discontinuance of the Watershed District was filed with the sec-

retary of the Webster County Board of Supervisors of the Soil Conservation District on March 9, 1962. Those seeking to dissolve the Watershed District proceeded under KRS 262.790. It provides as follows:

"(1) At any time after five years from the organization of a watershed conservancy district, twenty-five or more landowners within a district, or, if less than fifty landowners are involved, a majority of the landowners in such district, may file a petition with the board of supervisors, praying that the existence of the district be discontinued. The petition shall state the reasons for discontinuance, and that all obligations of the district have been met.

"(2) After giving notice as defined in KRS 262.010(4), the board of supervisors may conduct such hearings on the petition as may be necessary to assist it in making a determination.

"(3) Within sixty days after petition is filed, a referendum shall be held under the supervision of the board of supervisors as provided in KRS 262.750. No informalities in the conduct of the referendum or in any matters relating to the referendum shall invalidate it or its result if notice of the referendum has been given substantially as provided in subsection (2) of this section.

"(4) If a majority of the votes cast in such referendum favor the discontinuance of the district, and it is found that all the obligations have been met, the board of supervisors shall make a determination that the watershed conservancy district shall be discontinued. A copy of the determination shall be certified to the clerk of the county or counties involved, for recording. After recording, the certification shall be filed with the State Soil Conservation Committee."

The petition was signed by 276 people. It stated that the signers were landowners within the Watershed District; that a majority of the landowners in the Watershed

District desired to discontinue it; that all the obligations of the Watershed District, within the meaning of subsection (1) of KRS 262.790, had been met. The petition prayed that the Watershed District be discontinued.

It may be noted from the above quoted statute that subsection (2) provides that after the presentation of a petition for discontinuance the Board of Supervisors may conduct such hearing as may be necessary to assist it in making a determination: As the trial court queried, "a determination of what"? However, the Board of Supervisors did hold a hearing under the section and determined, as reflected by the minutes of the meeting, that in light of numerous obligations of the Watershed District "the petition was not in order and the district could not possibly be dissolved." Some of the obligations, according to the Board, resulted from possible liabilities on the supersedeas bond in condemnation cases, costs in said cases, commissioners' fees, attorneys' fees, and other record fees and court costs. Other obligations existed in favor of the United States Government under a work plan. In addition, these reasons for dismissal of the petition were stated in the minutes:

"It was pointed out that the operation of Crab Orchard Creek Watershed Conservancy District had previously been determined to be administratively practical and feasible and was even more so at this time. Further, that there was no other statute or statutes under which the objectives of the Conservancy District could be accomplished; and that, although no detailed investigation had been undertaken of sentiment within the District, it appeared highly doubtful that a majority of the landowners in the District desired to have it discontinued."

The Board of Supervisors decided that it would not hold the referendum provided for by the statute and this action followed. After trial the court entered a judgment ordering the Board to call and hold a refer-

endum. Appellants argue that the court erred in ordering the referendum because (1) the District's obligations had not been met as required by the statute and (2) the landowners did not state their reasons for wanting a discontinuance as required by the first subsection of the statute.

It is insisted by appellants that the word "obligations" means more than financial obligations and includes actions and operations which a District has agreed to perform in its work plan. It is argued that because the word "financial" is not used anywhere in the statute, the word "obligations" cannot be so limited. Stress is also placed upon the wording that "all the obligations have been met," and it is contended that "have been met" may not be construed to mean "can be met." Thus a petition could not be filed properly until all financial obligations of the District actually had been discharged.

In a written opinion the trial court carefully analyzed this statute and correctly applied its terms to the facts presented. We adopt the following portion as the opinion of this Court:

"In order to construe any one section of this statute in an attempt to determine its meaning we must consider it in relation to the entire section, and we must admit that this section is difficult of interpretation.

"The basic problem is in determining whether or not the board shall call the election in any event or shall it call it only after and in the event it determines it has met all of its obligations.

"Subsection 2 provides that the board may conduct such hearings on the petition as may be necessary to assist it in making a determination. The question is, 'a determination of what?' Must the board make a determination that the reasons for wanting a termination are reasonable and that its obligations have been met? There is nothing in this section that gives any indication of the purpose of the section.

"Then subsection 3 says the board shall conduct the referendum. There is no language in the section qualifying this mandate that the referendum shall be held only in the event the board determines all the obligations have been met or that the reasons are reasonable.

"Then subsection 4 complicates the issue further by stating that if a majority of the votes cast favor the discontinuance and it is found that all obligations of the district have been met, the board shall then make a determination that the district be discontinued. This might lead one to believe that the vote would come first and if the vote was in favor of discontinuance, then there must be a determination that the obligations have been met before the district could be discontinued. This seems to be an unrealistic interpretation of this section. The most difficult, costly and time consuming step in the procedure would be calling and holding the referendum and it would be foolish to go through this procedure only to find that the obligations have not been met and the results of the referendum nullified. The more sensible interpretation of this section, it seems to the Court, would be that if the board determines that the obligations have been met, then and only then must the referendum be called.

"It is argued that not only must the proponents show that the obligations have been met but also must allege and prove the reasons for the desired termination. The Court cannot agree with this interpretation. The only mention of the reasons is contained in the section requiring the petition to the board to state the reasons. I don't think the Board has any discretion in determining the soundness of the reasons. This is very evident from subsection 4, which sets as the only condition for the calling of the referendum that the obligations have been met.

"We then come to the question of whether the obligations have been met and what is meant by obligations. I think

the only obligations that the Legislature is referring to are financial obligations. Otherwise the section is meaningless and no discontinuance could ever be had because in operating the district there is a continual and eternal obligation of up-keep. We know this from our experience with the public drainage ditches and the structure under this program would no doubt require even more upkeep than the drainage ditch situation.

"The proof shows that cash on hand in the treasury of the district is $10,283.93. There are condemnation proceedings now pending, together with attorney fees and court costs which would in all probability take up or exceed the amount on hand. However, the obligation to pay for the land sought to be condemned does not become vested until the district receives title to the land and takes possession and this had not been done as of the date of the filing of the petition and has not yet been done and there is no binding obligation on the part of the district to take the land. The condemnor can dismiss its petition for condemnation at any time before receiving title to the land and taking possession. This being so, the only obligations which are binding on this fund are the attorney fees and court costs and the fund is more than ample to provide for these obligations.

"It is the Court's personal belief that these Conservancy Districts and the whole soil conservation program are of great benefit to the people and I believe that there is a great need for this program; however, this program, like any program, to be successful, must have the support of the majority of those involved. If it does not it is doomed to failure. The Legislature has set up the provisions for determining the feeling of the people and any dissenters are entitled to have their vote. It is my opinion that the Board of Supervisors shall call this election and further, I am holding Counsel for the plaintiff to his offer in his brief in one of the related suits, to dismiss with prejudice all other actions now pending against the Board and District by the dissenters as soon as the election is called."

It will be noted that in the last sentence of the foregoing quotation, the court refers to other cases then pending. One is the Clifton Shelton case which appears in the caption to this opinion. In that case appellant states that in the event the Watson case is affirmed and referendum is allowed, it will not insist upon a reversal in the Shelton case. That appeal is therefore abandoned.

Both judgments are affirmed.

PALMORE, J., not sitting.